UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDDIE JONES, | ) | 1:06-CV-0379 AWI JMD HC |
| | ) | |
| Petitioner, | ) | |
| | ) | AMENDED FINDINGS AND |
| v. | ) | RECOMMENDATION REGARDING |
| | ) | PETITION FOR WRIT OF HABEAS |
| | ) | CORPUS |
| KATHY MENDOZA-POWERS, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Orange County Superior Court. (Answer at 1.) A jury convicted him of one count of second degree murder and one count of grand theft. (Id.) The trial court sentenced him to fifteen-years-to-life for the murder and to a concurrent term of two years for the grand theft. (Answer at 1-2.) On May 30, 1991, the Court of Appeal affirmed the murder conviction, but reduced the grand theft conviction to petty theft. (Answer, Ex. C.)

On January 24, 2005, Petitioner appeared before the Board of Prison Terms for a parole consideration hearing. The Board granted parole. The Governor, however, reversed the Board's decision. (Answer at 3.)

1	Petitioner filed a petition for writ of habeas corpus in the Orange County Superior Court
2 challenging the Governor's reversal.  The court denied the petition in a reasoned opinion.  (Answer
3 at 4; Ex. E.)
4	 Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  The
5 court summarily denied the petition.  (Answer at 4; Ex. F.)
6	Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  The
7 court summarily denied the petition.  (Answer at 4; Ex. G.)
8	On March 16, 2006, Petitioner filed the instant petition in the Southern District of California.
9 On April 5, 2006, the petition was transferred to this Court.  The petition raises the following four
10 grounds for relief: 1) the Governor's review of the grant of parole violated the Ex Post Facto Clause;
11 2) the Governor's reversal based on the commitment offense violated Petitioner's constitutional
12 rights; 3) the Governor's speculation regarding possible witness testimony violated Petitioner's
13 constitutional rights; and 4) the Governor's consideration of matters outside the record violated
14 Petitioner's due process rights.
15	On June 1, 2007, Respondent filed an answer to the petition.
16	On June 25, 2007, Petitioner filed a traverse to the answer.
17	On September 4, 2008, the undersigned issued a Findings and Recommendation
18 recommending that the petition be denied with prejudice.  On September 25, 2008, Petitioner filed
19 objections to the Findings and Recommendation.  On October 23, 2008, the Honorable Anthony W.
20 Ishii referred the petition back to the undersigned to consider what effect, if any, *In re Lawrence*, 44
21 Cal.4th 1181 (2008), had on Petitioner's second ground for relief. (Court Doc. 16.)

## FACTUAL BACKGROUND[1]

23	16-year-old Rachel C. lived with her mother and her mother's boyfriend Richard Hopking.
24 On February 17, 1988, Hopking was home on vacation.  Rachel stayed home from school claiming
25 to be ill.  Rachel left the house with Petitioner and they met 15-year-old Laura P. at about 10 a.m. in
26 the parking lot of Los Alamitos High School.  Laura was a friend of Rachel's and was leaving school

---

[1] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of May 30, 1991.  (Answer, Ex. C.)

1  because she was ill.  Rachel and Petitioner offered to take Laura home, but instead drove to Los
2  Angeles where they picked up Ramon Birl.  Rachel was apparently romantically involved with both
3  Petitioner and Birl.  She asked Laura to pretend she was with Petitioner so Birl would not get
4  jealous.
5     The four went to Rachel's house.  Hopking was working in the backyard.  After a brief
6  conversation in the front yard, Birl left and Petitioner, Rachel, and Laura went inside.  Rachel and
7  Petitioner went into Rachel's bedroom and Laura watched for Birl's return.  She saw Hopking come
8  in and talk on the telephone before handing it to Rachel as the others returned to the front yard.
9     When Rachel came outside she was crying.  She had been talking to her mother and said
10 Hopking had told her mother that Petitioner was in her bedroom.  Laura suggested she run away for a
11 few days.  Rachel took Petitioner's car and drove away to calm down.  Petitioner and Birl asked
12 Laura if Hopking "tried things" with Rachel.  Laura was unsure but said that Rachel had told her that
13 Hopking stared at her when she got out of the shower.  Petitioner picked up a rock and said he would
14 hit Hopking "upside the head" and get him out of Rachel's hair.  Birl said he would help.  Laura
15 thought they were joking.
16    Rachel returned and Laura left with her for a while.  When they returned Petitioner told them
17 he had gone into the yard to apologize to Hopking for causing trouble.  He tried to hit Hopking with
18 a rock while his back was turned, but he turned around too soon so he hid the rock behind his back.
19 Laura was not sure if he was serious.  Laura left Rachel's house at about 3 p.m.
20    Marcella Scales, a neighbor, saw Hopking mowing the lawn and Rachel, another girl, and
21 two males in the front yard, and then watched Hopking enter the house.  About 30 minutes later she
22 saw Rachel drive Hopking's car into the garage.  Subsequently one of the males placed a small stereo
23 and bedding in a white car and she noticed Hopking's car parked back on the street.  One of the
24 males walked across the street wiping his hands on a rag which he threw away.  He drove off in
25 Hopking's car.  Rachel and the other male drove off together in the white car.
26    At about 4 p.m. Petitioner, Birl, and Rachel arrived at the home of Danielle K., driving the
27 white car and a second car (presumably Hopking's).  Danielle was Petitioner's fiancee with whom he
28 lived occasionally.  The white car belonged to Danielle.  Petitioner had cuts under his eye and on his

hands and forehead.  He was upset and crying.  He took Danielle outside and showed her a body in the trunk of the second car.  Birl, Petitioner, and Rachel left in the second car.  Later that evening Danielle, at Petitioner's request, picked up Petitioner and Rachel and they placed some items in the trunk of her car.  Danielle drove to Long Beach where they left Rachel before returning to Danielle's house.

When Rachel's mother returned home from work that evening, Hopking was missing and there was blood on the walls.  She found a broken vase in the hall.  The toilet tank lid was missing and the shower door was broken.  She found an electric cord in the kitchen trash can and some soapy discolored water.  Two trophies, a vase, a comforter, and a stereo from Rachel's room and Hopking's wallet and car keys were missing.  There was a large bloodstain on the dining room carpet.  Police investigators found more blood stains in the kitchen, bedroom, hallway, bathroom, and living room.  Two of the stains were consistent with Petitioner's blood type; the others were Hopking's.

The police, with Rachel's assistance, found Hopking's car the next day in Compton.  Hopking's body was in the trunk.  Petitioner's and Birl's fingerprints were found on the car.  An autopsy revealed at least 20 wounds to Hopking's body, including 19 head injuries.  The injuries were consistent with being struck by at least three different objects, including a glass vase, a trophy base, and a rock.  He also had broken ribs and ligature marks on his wrists, suggesting his hands had been tied together, possibly with the electric cord.

Petitioner and Birl admitted killing Hopking, but contended they did so in defense of themselves and of Rachel.  While they were standing in front of Rachel's house, she came out crying.  In the past she had complained about Hopking and said he was "messing with her."  She had also told them he would come in her room at night and look at her when she got out of the shower.  Birl believed Hopking had been sexually abusing Rachel.  Petitioner and Birl believed Hopking had made some type of sexual advance towards Rachel.  Laura suggested that Rachel run away from home and Petitioner said he would help.

While the two girls were gone, Petitioner and Birl went into the backyard where Hopking was working.  Petitioner apologized for having caused any trouble.  He did not have anything in his hands.  When the girls returned, Petitioner and Birl were helping Rachel put her things in the car.

1   While they were outside, they heard Rachel scream for help.  She said, "Help me," and "Get away
2   from me," or "Get off me."  Petitioner and Birl thought Hopking was attacking Rachel.  Petitioner
3   ran into the house and saw someone go into Rachel's bedroom.  He ran back outside, grabbed a rock,
4   and went back in.  Birl also picked up a rock and followed.

5       Petitioner went into Rachel's bedroom.  She was on the bed; Hopking was standing over her
6   and appeared to be grabbing her.  Petitioner yelled at Hopking to leave Rachel alone.  Hopking
7   attacked him and he hit Hopking with the rock more than once and then dropped the rock.  Hopking
8   was holding Petitioner when Birl hit Hopking with his rock.  Hopking then turned on Birl as
9   Petitioner tried to stop him.  Petitioner and Hopking fought into the bathroom.  Hopking pushed
10  Petitioner into the shower door, shattering it, and picked up the toilet tank lid, but Petitioner grabbed
11  his arms and he dropped it.  Petitioner and Hopking continued fighting.  Petitioner tried to get away,
12  but Hopking kept attacking.  Birl hit Hopking with the rock and a trophy base.  Petitioner tried to run
13  to the front door, but Hopking grabbed him and they struggled in the living room.  Birl then began
14  hitting Hopking in the head until he fell to the floor.  Petitioner left the room to get Rachel.  Birl
15  continued to hit Hopking several more times.  He then came to the bathroom and told Petitioner and
16  Rachel that Hopking was dead.

17      The three made an attempt to clean up the house.  They put the body in the trunk of
18  Hopking's car and drove off.  They left the car Petitioner had been driving at Danielle's house and
19  drove around in Hopking's car.  After dropping Birl off somewhere, Rachel and Petitioner used
20  Hopking's credit card to buy gasoline.  The car subsequently broke down and they abandoned it.

21      Hopking's car cellular telephone was missing when the police found the car with Hopking's
22  body in it.  Petitioner offered to sell the telephone to his uncle for $200, explaining he wanted some
23  money for Rachel.

24  **I.  Jurisdiction**

25      Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant
26  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of
27  the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362,
28  375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

1  Constitution.  In addition, Petitioner is confined at Avenal State Prison, which is located within the
2  jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).  Accordingly, the Court has
3  jurisdiction over the action.
4      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of
5  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.
6  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997),
7  *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997),
8  *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only
9  applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment
10 of the AEDPA; thus, it is governed by its provisions.

11 **II.  Legal Standard of Review**

12      This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody
13 pursuant to the judgment of a State court only on the ground that he is in custody in violation of the
14 Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

15      The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death
16 Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).
17 Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of
18 the claim "resulted in a decision that was contrary to, or involved an unreasonable application of,
19 clearly established Federal law, as determined by the Supreme Court of the United States" or
20 "resulted in a decision that was based on an unreasonable determination of the facts in light of the
21 evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at
22 70-71; see Williams, 529 U.S. at 413.

23      As a threshold matter, this Court must "first decide what constitutes 'clearly established
24 Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71,
25 *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court
26 must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time
27 of the relevant state-court decision."  Id., *quoting* Williams, 592 U.S. at 412.  "In other words,
28 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set

forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**[2]

    **A.  Ground One**

Petitioner argues that the Governor's reversal of his grant of parole violated the Ex Post Facto Clause because Petitioner's commitment offense occurred before the establishment of the Governor's authorization to review parole decisions.

This claim was presented in a petition for writ of habeas corpus to the California Supreme Court, which summarily denied the petition.  (Answer, Ex. G.)  When the state court reaches a decision on the merits but provides no reasoning to support its conclusion, we independently review the record to determine whether the state court clearly erred in its application of Supreme Court law.  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  However, although we independently review the record, we still defer to the state court's ultimate decision.  Id.

"The States are prohibited from enacting an ex post facto law.  One function of the Ex Post Facto Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission.  Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept."  Garner v. Jones, 529 U.S. 244, 249-50 (2000) (citations omitted).

In 1988, California voters approved Proposition 89, which added Section 8(b) to Article V of the California Constitution.  The implementing legislation, Penal Code section 3041.2, provided the Governor with authority to review and modify parole decisions regarding certain prisoners.  Johnson v. Gomez, 92 F.3d 964, 965 (9th Cir. 1996).  The Ninth Circuit Court of Appeals has rejected the claim that application of Proposition 89 to prisoners who committed offenses prior to its passage violates the Ex Post Facto Clause.  Id. at 967 ("We therefore conclude that the application of Proposition 89 to authorize the governor's review of Johnson's grant of parole did not violate the Ex Post Facto Clause."); see Moreno v. Mendoza-Powers, 2007 WL 4170720, *7 (E.D. Cal. 2007).  Further, Petitioner has not shown that the Governor's review of his case violated ex post facto

---

[2] Petitioner's request for judicial notice, filed May 15, 2008, is granted as federal courts are bound to take judicial notice of state decisional law.  Lamar v. Micou, 114 U.S. 218, 223 (1885); see White v. Gittens, 121 F.3d 803, 805 (1st Cir. 1997) ("[W]e may take judicial notice of published state court dispositions of cases.").

principles as articulated in *Garner*.  See Seiler v. Brown, 2007 WL 2501518, *4-*5 (N.D. Cal. 2007); In re Rosenkrantz, 29 Cal.4th 616, 646-52 (2002).

### B.  Ground Two

Petitioner argues that his rights were violated when the Governor reversed his grant of parole. Petitioner claims that the Governor improperly relied on the nature of his commitment offense and unfairly ignored his accomplishments.

This claim was presented in a petition for writ of habeas corpus to the Orange County Superior Court, which denied the petition in a reasoned opinion.  (Answer, Ex. E.)  The issue was then raised in petitions for writ of habeas corpus to the California Court of Appeal and California Supreme Court, which summarily denied the petitions.  (Answer, Exs. F-G.)  The Court of Appeal and California Supreme Court, by their "silent orders" denying the petitions, are presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Superior Court found that there was some evidence supporting the Governor's determination that Petitioner was unsuitable for parole, as his commitment offense was heinous and he lacked remorse and an adequate understanding of the magnitude of his offense.  (Answer, Ex. E.)

"We analyze a due process claim in two steps. '[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'"  Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006).  California's parole scheme gives rise to a cognizable liberty interest in release on parole.  Id. at 1127-28.  However, "because parole proceedings are not part of the criminal prosecution, the full panoply of rights due a defendant in a criminal proceeding is not constitutionally mandated.  Instead, the due process rights that flow from a liberty interest in parole are limited: the prisoner must be provided with notice of the hearing, an opportunity to be heard, and if parole is denied, a statement of the reasons for the denial.  In addition, due process requires that 'some evidence' support the [determination regarding parole], and that the evidence relied upon must possess 'some indicia of reliability.'  The 'some evidence' standard is

satisfied if there is any reliable evidence in the record that could support the conclusion reached. Finally, determining whether the 'some evidence' standard was met does not require examination of the entire record, independent assessment of the credibility of witnesses, or the weighing of evidence." Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1079-80 (C.D. Cal. 2006) (citations omitted); see also Sass, 461 F.3d at 1128-29.

In the recent case of In re Lawrence, 44 Cal.4th 1181 (2008), the California Supreme Court attempted to clarify the analysis that must be undertaken when reviewing a decision relating to a prisoner's current suitability for parole. The court explained that, when reviewing a decision of the Board of Parole Hearings or the Governor, the relevant inquiry is "whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212 (2008). The court acknowledged that resolving conflicts in the evidence and deciding the weight to be given to particular evidence are within the authority of the Board or Governor and that each has broad discretion that will only be disturbed when due consideration is not given to the specified factors. Id. at 1204.

The *Lawrence* court also addressed how the nature of a prisoner's commitment offense affects the parole suitability determination, concluding that the Board and Governor may rely on the nature of the commitment offense as a basis to deny parole when, considered in light of other facts in the record, the offense continues to be predictive of current dangerousness. Id. at 1221. The court explained that other facts relevant to determining the probative value of the commitment offense include the amount of time since the offense, the prisoner's history before and after the offense, and the prisoner's current demeanor and mental state. Id. at 1211, 1214, 1219, 1221.

Based on the facts in *Lawrence*, the court concluded that the Governor could not rely solely on the commitment offense to deny parole, as 36 years had passed since the time of the offense and because "all of the information in [the] postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety." Id. at 1226-27.

Here, the state court's determination that Petitioner's rights were not violated was not unreasonable. Petitioner was provided a parole hearing in which he and his counsel took part.

1  (Petition, Ex. 1.)  He was also provided the written opinion of the Governor setting forth the reasons
2  for the reversal of his grant of parole.  (Petition, Ex. 2.)

3        The first reason given by the Governor for reversing the parole decision was the nature of
4  Petitioner's commitment offense.  The Governor identified the fact that Petitioner and his crime
5  partner took part in "a lethal attack with rocks upon a 60-year-old man who was outnumbered and
6  unarmed," then cleaned up the crime scene, concealed the body, and stole the victim's car and credit
7  card.  (Petition, Ex. 2 at 2.)  The Governor noted that evidence showed that the attack on the victim
8  continued despite his attempt to flee and that he ultimately suffered 19 lacerations, massive skull
9  fractures, and multiple contusions.  The Governor further noted that Petitioner was the prime mover
10 of the assault and that there was evidence the attack was premeditated and possibly the result of the
11 desire of Petitioner and his crime partner to steal the victim's car.  (Id.)  These findings were
12 sufficient to establish one circumstance of Petitioner's unsuitability for parole, as they show that
13 Petitioner committed the offense in an especially heinous, atrocious, or cruel manner, as defined in
14 the parole guidelines.  See Cal. Code Regs., tit. 15, § 2402(c)(1) (stating that factors to be considered
15 in determining whether offense was especially heinous, atrocious, or cruel include committing an
16 offense in a manner demonstrating exceptionally callous disregard for human suffering or with a
17 motive that is very trivial in relation to the offense).

18       The Governor also cited the fact that Petitioner lacked remorse and understanding of the
19 nature and magnitude of the offense he committed, as evidenced by his version of how the crime
20 occurred.  The Governor explained that Petitioner's claim that he was acting in defense of Rachel
21 Carter was contradicted by Ms. Carter's own statements that the victim did not try to assault her on
22 the day of the murder and that he had never hurt her.  The Governor further noted that there was
23 evidence showing that, prior to the crime, Petitioner had discussed attacking the victim and stealing
24 his car.  (Petition, Ex. 2 at 2.)  These facts were properly considered and had some indicia of
25 reliability.  See Cal. Code Regs., tit. 15, § 2402(b) ("All relevant, reliable information available to
26 the panel shall be considered in determining suitability for parole."); Cal. Code Regs., tit. 15, §
27 2402(c) (stating that the enumerated unsuitability factors are only set forth as general guidelines).

28       The evidence taken as a whole is sufficient to show that it was not unreasonable for the state

court to conclude that there was "some evidence" supporting the Governor's determination that Petitioner posed an unreasonable risk of danger to society if released from prison. See Cal. Code Regs., tit. 15, § 2402(b) ("Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."); see Hayward v. Marshall, 512 F.3d 536, 543 & n.8 (9th Cir. 2008) (recognizing that factors showing unsuitability for parole include committing the offense in an especially heinous, atrocious, or cruel manner and engaging in serious misconduct while in prison); Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1129 (9th Cir. 2006) (finding "some evidence" standard satisfied based on gravity of convicted offenses in combination with previous offenses).

The analysis set forth in *In re Lawrence* does not compel a different finding. In that case, the Governor denied parole based solely on the commitment offense, which had occurred 36 years earlier, despite "all of the information" in the post-conviction record supporting the prisoner's parole. Here, the Governor relied not only on the commitment offense, but also on the fact that Petitioner lacked remorse and understanding of the nature and magnitude of his offense, as evidenced by the fact that his version of events differed significantly from other reliable evidence in the record. The Governor has discretion to resolve such conflicts in the evidence. In re Lawrence, 44 Cal.4th 1181, 1204 (2008); In re Shaputis, 44 Cal.4th 1241, 1258 (2008) ("When a court reviews the record for some evidence supporting the Governor's conclusion that a petitioner currently poses an unreasonable risk to public safety, it will affirm the Governor's interpretation of the evidence so long as that interpretation is reasonable and reflects due consideration of all relevant statutory factors."). The aggravated and premeditated nature of Petitioner's commitment offense and his lack of understanding of the nature and magnitude of the offense constituted some evidence that Petitioner posed an unreasonable risk to public safety. See In re Shaputis, 44 Cal.4th 1241, 1258-61 (2008) (affirming Governor's denial of parole based on premeditated nature of commitment offense and lack of insight, despite prisoner's many years of laudatory work reports, discipline-free record, participation in many rehabilitative programs, and acknowledgment that crime was wrong).

### C. Grounds Three and Four

Petitioner argues that his rights were violated when the Governor improperly considered the appellate record and probation report and when he speculated about the possible testimony of Rachel Carter.

These claims were presented in a petition for writ of habeas corpus to the Orange County Superior Court, which denied the petition in a reasoned opinion. (Answer, Ex. E.) The Superior Court, however, did not directly address these claims in its opinion. The issues were then raised in petitions for writ of habeas corpus to the California Court of Appeal and California Supreme Court, which summarily denied the petitions. (Answer, Exs. F-G.) When the state court reaches a decision on the merits but provides no reasoning to support its conclusion, we independently review the record to determine whether the state court clearly erred in its application of Supreme Court law. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). However, although we independently review the record, we still defer to the state court's ultimate decision. Id.

Petitioner has not shown that the Governor improperly considered the appellate record and probation report in reversing his grant of parole. When reviewing parole decisions, "the Governor's review is limited to a consideration of the record before the hearing panel." In re Arafiles, 6 Cal.App.4th 1467, 1477 (1992); Cal. Penal Code § 3041.2(a). Here, however, during Petitioner's parole hearing, the presiding commissioner noted that the Board had reviewed Petitioner's "Central File and prior transcripts." (Petition, Ex. 1 at 5.) The Court of Appeal opinion disposing of Petitioner's appeal and the probation report would presumably be included in Petitioner's central file and prior transcripts. Further, Respondent asserts that they were part of the central file, and Petitioner has presented no evidence to the contrary. (Answer at 17.)

Petitioner has also not shown that the Governor improperly speculated about the likely testimony of Rachel Carter. The Court of Appeal, in its opinion disposing of Petitioner's appeal, discussed the expected testimony of Ms. Carter based on an offer of proof made by Petitioner to the trial court. (Answer, Ex. C at 8-11.) The Governor's reversal of Petitioner's grant of parole accurately recounted the facts stated in the opinion of the Court of Appeal. (Answer, Ex. D.)

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   October 28, 2008**              /s/ John M. Dixon
                                    UNITED STATES MAGISTRATE JUDGE