UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDDIE JONES, | ) | 1:06-CV-379AWI JMD (HC) |
| | ) | |
| Petitioner, | ) | ORDER DECLINING TO ADOPT |
| | ) | AMENDED FINDINGS AND |
| | ) | RECOMMENDATION |
| | ) | [Doc. #18] |
| v. | ) | |
| | ) | ORDER GRANTING PETITION FOR WRIT |
| | ) | OF HABEAS CORPUS |
| | ) | |
| KATHY MENDOZA-POWERS, | ) | ORDER DIRECTING CLERK OF COURT |
| | ) | TO ENTER JUDGMENT |
| Respondent. | ) | |

  Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

  The Magistrate Judge issued a Findings and Recommendation on September 4, 2008, that recommended the petition be DENIED with prejudice. The Magistrate Judge further recommended that the Clerk of Court be DIRECTED to enter judgment. The Findings and Recommendation was served on all parties and contained notice that any objections were to be filed within thirty (30) days of the date of service of the order.

  On September 25, 2008, Petitioner filed objections to the Findings and Recommendation, in which Petitioner cited extensively to the new California Supreme Court decision In re Lawrence, 44 Cal.4th 1181 (Cal. 2008). The Court referred the petition back to the Magistrate Judge on October 23, 2008, to consider the effect of Lawrence.

  The Magistrate Judge issued an Amended Findings and Recommendation on October 29,

2008, that recommended the petition be DENIED with prejudice. The Magistrate Judge further recommended that the Clerk of Court be DIRECTED to enter judgment. The Findings and Recommendation was served on all parties and contained notice that any objections were to be filed within thirty (30) days of the date of service of the order.

Petitioner filed objections to the Amended Findings and Recommendation on November 14, 2008. In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C), this Court has conducted a *de novo* review of the case. Having carefully reviewed the entire file and having considered the objections, the Court respectfully declines to adopt the Magistrate Judge's Findings and Recommendation.

## **BACKGROUND**[1]

On October 25, 1989, a jury convicted Petitioner on one count of second degree murder and one count of grand theft.[2] On February 23, 1990, Petitioner was formally sentenced to 15 years to life in prison. On January 24, 2005, Petitioner appeared before the Board of Parole Hearings ("BPH") for a parole consideration hearing. The BPH granted parole. However, the Governor reversed the BPH's decision. Through state habeas corpus proceedings, the California courts denied Petitioner's challenges to the Governor's decision.

At the time of the commitment offense, Petitioner was 17 years old. See Transcript at p. 9. Briefly, on February 17, 1988, Petitioner and another teenage friend (Birl) killed 60-year old Richard Hopking. Hopking was living with 15-year Rachel C. and Rachel's mother. Rachel and Petitioner were friends and romantically involved. On the day of the murder, Petitioner, Rachel, Birl, and another friend (Laura) basically skipped school and went to Rachel's house. Hopking called Rachel's mother and said that Rachel and Petitioner were in Rachel's bedroom. Rachel talked with her mother and then left the house crying. Petitioner asked Laura if Hopking "messed with" Rachel, and Laura said that Hopking sometimes would stare at Rachel. Laura said that Petitioner then picked

---

[1] This background is derived from the BPH January 24, 2005 hearing transcript (hereinafter "Transcript"), the Court of Appeals's description (hereinafter "Respondent's Exhibit C"), and the Governor's description of the crime (hereinafter "Respondent's Exhibit D").

[2] The conviction for grand theft was reduced to petty theft on appeal. See Respondent's Exhibit C.

1   up a rock and said that he would hit Hopking in the head and take care of Rachel's problem.  Rachel
2   and Laura then left the house, but returned later.  Upon their return, Petitioner told Laura that he had
3   spoken to Hopking to apologize for causing a problem with Rachel's mother, was going to hit
4   Hopking with a rock, but Hopking turned around too quickly; Laura did not know if Petitioner was
5   serious.  See Respondent Exhibit C at p.4.[3]  Later that day, Rachel and Hopking had some kind of
6   altercation.  Rachel screamed for help, Petitioner and Birl came into the house and attacked Hopking
7   with rocks.[4]  See Transcript at pp. 10-11; Respondent Exhibit C at pp. 6, 10; Respondent Exhibit D.
8   Petitioner, Birl, and Hopking fought through the house, and, in addition to rocks, it appears that a
9   trophy and a glass vase were used as weapons against Hopking.  See Respondent's Exhibit C at p.5.
10  After Hopking fell, Petitioner stepped away from the melee, but Birl continued to attack Hopking
11  until Birl later announced that Hopking was dead.[5]  See Respondent's Exhibit C; Respondent Exhibit
12  D.  An autopsy report revealed that Hopking had sustained at least 20 wounds, including 19 head
13  injuries.  See Respondent's Exhibit C at p.5.  After Hopking was murdered, Petitioner, Birl, and
14  Rachel unsuccessfully tried to clean the house.  They then placed Hopking's body in the trunk of his
15  car and drove off.  Petitioner and Rachel used Hopking's credit card to buy gasoline.  Petitioner took
16  Hopking's cellular telephone and sold it to his uncle for $200.  Petitioner contends he did so to get
17  money for Rachel.  On February 22, 1988, Petitioner was arrested.
18          At the parole hearing, it was determined that Petitioner had no prior criminal history.  See
19  Transcript at 50.  Petitioner had turned 34 years old.  See id. at 51.  In prison, Petitioner had
20  improved himself educationally and vocationally.  See Transcript at 24-31, 50-54.  He had
21  participated in self-help.  See id.  He had made viable housing and employment plans.  See id.  His

---

[3] It appears Petitioner denies Laura's account of the conversation from when Laura and Rachel returned, but does admit making statements to Laura about "taking care" of the situation with Hopking.  See Respondent Exhibit C at p.6; Transcript at 34, 41-42.

[4] Petitioner contended that he saw Hopking standing over Rachel in her bedroom.  In a transcript, of a police/district attorney interview, Rachel stated that she screamed once for help, ran away from Hopking, saw Petitioner and Birl enter the home, and then they attacked Hopking.  See Respondent's Exhibit C at pp.6, 9-11.

[5] Although it appears that Birl landed the fatal blow, "under the principles of accomplice liability, [Petitioner] is equally culpable for the murder of [Hopking] although he did not actually" deliver the fatal blow.  In re Bettencourt, 156 Cal. App. 4th 780, 801 (2007).

classification score in prison was the lowest possible. See id. He worked exceptionally well within the prison making furniture. See id. He had one serious rules violation in prison in 1994. See id. at 52. Petitioner was counseled seven times, the last being in 1996. See id. at 52.[6] His psychological reports were very positive and supportive of release. See id. Petitioner expressed remorse and accepted responsibility for Hopking's death, and the BPH found that Petitioner's remorse was evident through the hearing, the counselor reports, and the psychological evaluations. See id. at 11-14, 34, 48-49, 52  One of the panel members spoke of Petitioner in glowing terms, after describing Petitioner's positive write ups, evaluations, and activities. See id. at 25-29. After reviewing the information in Petitioner's file and interviewing Petitioner, the BPH gave Petitioner a parole date. See id. at 50.

      The Governor reversed the parole decision and relied on essentially two considerations: the commitment offense and a transcript of Rachel's testimony.[7] See Respondent Exhibit D. With respect to the commitment offense, the Governor focused on the number of wounds sustained by Hopking, that Hopking was outnumbered and struggled to flee, and there was some indication of pre-meditation (from Petitioner's earlier statement with a rock in hand and the theft of Hopking's car). See id. With respect to Rachel's transcript, the Governor noted that it indicated that she only expressed dislike of Hopking (because Hopking frequently sided with Rachel's mother) and that Hopking did not try to assault her on the day of the murder. Rachel's testimony is contrary to Petitioner's contention that he was trying to prevent a sexual assault against Rachel. See id. The Governor explained, "Although [Petitioner] need not admit to the same version of events as depicted in the appellate record or as described by the witness to be found suitable by the Board for parole, I need not accept his version of events as true. Nor do I, and his version of events is some evidence that he lacks remorse and understanding of the nature and magnitude of the offense he committed."

---

[6] Neither the BPH nor the Governor indicated that the counseling chronos were significant.

[7] Rachel did not testify at Petitioner's murder trial, apparently because she was not offered immunity for her testimony. Rachel's transcript is from interviews that Rachel had with the police and the district attorney. Petitioner's attorney presented the transcripts to the trial court as part of an offer of proof. The Court of Appeal described the substance of the transcript and determined that there was no error in failing to give Rachel immunity, since the testimony fell short of that required for granting use immunity. The Court of Appeal noted that Rachel's testimony was contrary to Petitioner's version of events and would have done Petitioner more harm than good. See Respondent Exhibit C.

1  The Governor then reversed the BPH's decision.  Id.

2  In State proceedings, the Orange County Superior Court (the only state court to issue a reasoned opinion) denied Petitioner relief.  See Respondent's Exhibit F.  The Superior Court found support for the Governor's conclusions regarding the crime and Petitioner's insight/remorsefulness, and thus, upheld the Governor's reversal.[8]  See id.

## LEGAL STANDARD

When a petitioner is imprisoned from a state court adjudication and files a federal habeas petition after April 24, 1996, AEDPA governs and a court will not issue a writ of habeas corpus unless it is shown that the state court decision denying relief was "contrary to, or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S. C. § 2254(d)(1); Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007); Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006).

California Penal Code § 3041 vests all California prisoners "whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons, 505 F.3d at 850; see Sass, 461 F.3d at 1128; Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003).  Prior to 2005, "the Supreme Court had clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'"  Irons, 505 F.3d at 851; see Sass, 461 F.3d at 1128; Biggs, 334 F.3d at 915.  The "some evidence" standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could

---

[8] In part, the Superior Court also ruled that the Governor relied on evidence that showed Petitioner had made earlier statements that he was interested in Hopking's car and in getting Hopking out of Rachel's way.  See Respondent's Exhibit F. However, while the Governor stated that there was evidence that the crime was premeditated on "some level," that appears to be part of a discussion regarding the crime itself as that paragraph concludes that the premeditation aspect might have produced a first degree murder charge.  See Respondent's Exhibit D.  In terms of remorse and insight, the Governor relied on Rachel's transcript "testimony."  See id.  The "lack of remorse" paragraph does not discuss premeditation.  See id.

1  support the decision . . . ." Superintendent v. Hill, 472 U.S. 445, 455-56 (1985); Sass, 461 F.3d at
2  1128. State statutes and regulation concerning parole suitability frame the "some evidence"
3  analysis. Irons, 505 F.3d at 851. Therefore, courts "must look to California law to determine the
4  findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record
5  in order to determine whether the state court decision holding that these findings were supported by
6  'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle
7  articulated in *Hill*." Id.

8  Under California law, with respect to an eligible "life prisoner," the BPH "must 'normally set
9  a parole release date' before the minimum term has been served," but "an inmate shall be found
10 unsuitable for parole and denied parole if, in the judgment of the [BPH], the prisoner will *pose an*
11 *unreasonable risk of danger to society if released from prison*." Id. (quoting In re Dannenberg, 34
12 Cal.4th 1061, 1078, 1080 (2005) (quoting 15 C.C.R. § 2402(a))) (emphasis added); see also In re
13 Lawrence, 44 Cal.4th 1181, 1204 (2008). The BPH determines whether a prisoner is presently too
14 dangerous to be released on parole by examining criteria set forth in regulations. See 15 C.C.R. §
15 2402; Irons, 505 F.3d at 851-52; Biggs, 334 F.3d at 915-16. The criteria set by regulation reads:

> (b) All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.
>
> (c) The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>   (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>     (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>     (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>     (C) The victim was abused, defiled or mutilated during or after the offense.
>     (D) The offense was carried out in a manner which demonstrates an

>    exceptionally callous disregard for human suffering.
>    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.
>
> (d) The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:
>
> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
> (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
> (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
> (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
> (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
> (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
> (7) Age. The prisoner's present age reduces the probability of recidivism.
> (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
> (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 C.C.R. § 2402(b), (c), (d). Additionally, the "Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Cal. Pen. Code § 5011(b).

The key inquiry is not whether "some evidence" supports the presence or absence of a particular § 2402 factor, rather, the key inquiry is whether some evidence supports the conclusion that the prisoner currently poses an unreasonable risk of danger to society. See Lawrence, 44 Cal.4th

at 1210, 1227; In re Roderick, 154 Cal.App.4th 242, 263 (2007); In re Lee, 143 Cal.App.4th 1400, 1408 (2006). There must be a nexus between the factors that are cited by the BPH or the Governor and the determination of current dangerousness. See Lawrence, 44 Cal.4th at 1210; In re Rico, 171 Cal.App.4th 659, 686 (2009); In re Palermo, 171 Cal.App.4th 1096, 1107 (2009).

With respect to the commitment offense, the California Supreme Court has explained:

> [T]he Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance only if those facts support the ultimate conclusion that an inmate continues to pose an unreasonable risk to public safety. Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor.

Lawrence, 44 Cal.4th at 1221. Depending upon the circumstances, factors such as the passage of time and the prisoner's age may make continued reliance on unchanging factors like the nature of the commitment offense unreasonable. See id. at 1218-19, 1221; In re Roderick, 154 Cal.App.4th 242, 277 (2007); In re Elkins, 144 Cal.App.4th 475, 498-500 (2006); In re Lee, 143 Cal.App.4th 1400, 1412 (2006). As the Ninth Circuit has held, "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." Irons, 505 F.3d at 854; Lawrence, 44 Cal.4th at 1221.

**DISCUSSION**

The Court cannot agree that Petitioner has no remorse or no insight simply because he refuses to accept or agree to a particular version of the facts, i.e. Rachel's transcript. The Northern District of California has explained:

> The Governor found that Petitioner lacked insight into the commitment offense because he did not admit he was the shooter and, from this, the Governor concluded that Petitioner may commit similar crimes if released. In its April 9, 2008 Order, the Court addressed this same argument as presented by the Board and noted that California Penal Code § 5011(b) prevented the Board from requiring that an inmate admit guilt to any crime for which he or she was committed. The Court found that the Board could not deny Petitioner parole for not admitting to all of the facts of the crime as interpreted by the Board. The same reasoning applies to the Governor's reliance on this factor. Therefore, the fact that Petitioner did not admit he was the shooter cannot be relied upon as some evidence that he is currently a danger to the

1    public if released.

2    Guardado v. Perez, 2009 U.S. Dist. LEXIS 122220, *11 (N.D. Cal. Dec. 14, 2009).  To be sure, there

3    are cases in which a Petitioner's denial of facts may clearly show a lack of insight and current

4    dangerousness.  See In re Palermo, 171 Cal.App.4th 1096, 1110-12 (2009).  The Court in *Palermo*

5    explained when such circumstances exist:

> [I]n contrast to the situations in *Shaputis* and *McClendon*, defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational.  And, unlike the defendants in *Van Houten*, *Shaputis*, and *McClendon*, defendant accepted "full responsibility" for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole.  Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does not support the Board's finding that he remains a danger to public safety.

Id. at 1112.

Here, Petitioner's version of events does not strain credulity, is not physically impossible, is not irrational, and is not delusional.  Petitioner has acknowledge responsibility for the killing of Hopking, stated that he was remorseful, the BPH found Petitioner to be remorseful, and the BPH characterized the psychological reports as indicating that Petitioner is remorseful and has insight.[9]  Cf. Palermo, 171 Cal.App.4th at 1112 with Transcript at 11-14, 34, 48-49, 51-52.  That Petitioner does not fully accept every aspect of Rachel's transcript version of the events is not "some evidence" of current dangerousness.[10]  See Guardado, 2009 U.S. Dist. LEXIS 122220 at *11; Palermo, 171 Cal.App.4th at 1110-12; see also Cal. Pen. Code § 5011(b).

As to the commitment offense, the Court agrees with the Governor that the crime was especially heinous.  The 60-year old Hopking was beaten to death by two teenagers with rocks,

---

[9] The Court does not have a copy of the psychological reports.  However, the BPH stated that the psychological reports were supportive of release and showed that Petitioner had insight and was remorseful.  See Transcript at 52.  Neither the Superior Court nor the Governor indicate that the psychological reports were in any way negative and neither the Superior Court nor the Governor challenged the BPH's statements regarding the content of the psychological reports.  Without information that shows that the BPH's characterization of the psychological reports is inaccurate, the Court accepts the BPH's characterization.  See Transcript at 52.

[10] To the extent that there is a finding by the Governor or the Superior Court that Petitioner committed murder as part of a robbery, Petitioner has denied this theory, see Transcript at 34, the denial is not "unbelievable," and by statute, Petitioner is not required to agree that he was committing robbery.  See Cal. Pen. Code § 5011(b).

1 trophies, and a vase even though evidence suggests that Hopking tried to flee.[11]  Hopking suffered 19
2 wounds to the head.  This shows "an exceptionally callous disregard for human suffering."  See 15
3 C.C.R. § 2402(c)(1)(D).  However, that the commitment offense was especially heinous does not
4 alone show current dangerousness.  As *Lawrence* requires, "some evidence will support such
5 reliance [on the commitment offense and other unchanging facts] only if those facts support the
6 ultimate conclusion that an inmate continues to pose an unreasonable risk to public safety."
7 Lawrence, 44 Cal.4th at 1221.

8        Neither the Governor nor the Superior Court have explained what about this commitment
9 offense shows that Petitioner is *currently* a danger.  That is, there is no express nexus provided
10 between the facts of Hopking's murder and the Governor's finding of current dangerousness.  It is
11 unclear to the Court how the heinousness of the crime alone shows that Petitioner *currently* poses an
12 unreasonable danger to the public.  This is especially so in light of two uncontradicted facts: (1)
13 Petitioner left the attack in progress, and it was Birl who continued attacking until Hopking was
14 dead; and (2) Petitioner attacked Hopking after he heard Rachel scream for help.  These
15 uncontradicted facts tend to show that Petitioner was misguidedly reacting to Rachel.[12]

16        Further, California courts have recognized that a petitioner's young age is a relevant
17 consideration in the parole context.  See Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1084-85
18 (C.D. Cal. 2006); In re Barker, 151 Cal.App.4th 346, 376-77 (2007); In re Elkins, 144 Cal.App.4th at
19 500.  *Rosenkrantz*, *Barker*, and *Elkins*, have noted "the general unreliability of predicting violence is
20 exacerbated in a case by . . . petitioner's young age at the time of the offense [and] the passage . . . of
21 nearly twenty years since that offense was committed."  Rosenkrantz, 444 F.Supp.2d at 1084;
22 Barker, 151 Cal.App.4th at 376; Elkins, 144 Cal.App.4th at 500.  Here, Petitioner was seventeen
23 years old at the time that Hopking was murdered, and nearly twenty years (seventeen to be exact) had

---

[11] Rachel's transcript, as described by the Court of Appeal, indicates that Hopking was trying to flee.  See Respondent's Exhibit C at 10.

[12] The Court is not attempting to weigh or re-weigh evidence.  In the absence of the Governor and/or the Superior Court providing an express nexus between the facts of the commitment offense and the Governor's finding of current dangerousness, see Lawrence, 44 Cal.4th at 1227; Palermo, 171 Cal.App.4th at 1107, the Court is simply trying examine the facts of the murder in order to determine if something about those facts provides a nexus to current dangerousness.

passed from when the murder was committed to the parole hearing. Cf. id. In light of Petitioner's positive record in prison and lack of any other criminal history, the young age at which he committed this crime significantly diminishes the probative value of the commitment offense, as explained by *Rosenkrantz*, *Barker*, and *Elkins*.

In the absence of an expressly identified nexus, the Court does not see that the circumstances of the offense alone reflect a current level of unreasonable dangerousness. The attack did not occur until Rachel screamed for help, and Petitioner disengaged from the assault. Petitioner was a minor at the time of the murder and seventeen years had passed from the time of Hopking's death to the date of the parole hearing. This is a considerable amount of time. Further, as discussed above, that Petitioner does not agree with all aspects of Rachel's transcript version of events is not probative of current dangerousness. Additional facts, besides the heinousness of the commitment offense,[13] are necessary to show that Petitioner poses a current threat. However, the only other facts considered by the BPH and the Governor all support the BPH's decision to set a parole date. Petitioner was remorseful, had upgraded educationally and vocationally, had realistic parole plans, had engaged in self-help, had received positive evaluations from supervisors and psychiatrists, had no significant disciplinary history, and had no prior criminal record. There is not "some evidence" to support the Governor's conclusion that Petitioner currently poses an unreasonable risk to the public.

## CONCLUSION

Because the facts relied upon by the Governor do not amount to "some evidence" that Petitioner *currently* poses an unreasonable risk of danger to the public, and the only other facts presented and considered constitute evidence that would support parole under § 2402(d), the Governor's reversal of the BPH's grant of parole violated due process. The Court will grant Petitioner's petition for *habeas corpus*, reverse the Governor's reversal of the BPH, and reinstate the BPH's decision. See Vincent v. Mendoza-Powers, 2010 U.S. Dist. LEXIS 1592 (C.D. Cal. Jan. 6, 2010); Senteno v. California, 2009 U.S. Dist. LEXIS 121720 (E.D. Cal. Dec. 7, 2009).

---

[13] The Court is in no way minimizing the murder of Hopking.

U.S. District Court
E. D. California

11

Accordingly, IT IS HEREBY ORDERED that:

1. The Court DECLINES to adopt the Findings and Recommendation;
2. The Petition for Writ of Habeas Corpus is GRANTED;
3. The Governor's June 2005 reversal of the BPH's finding of suitability for parole is REVERSED;
4. The BPH's January 2005 finding of suitability for release on parole is REINSTATED and shall be IMPLEMENTED within 21 days from the date this Order is entered, according to the calculations provided in the BPH January 2005 decision, as adjusted to encompass any intervening considerations, such as credit for custodial time served since the release date he would have received on the January 2005 finding of suitability, or the date when that finding would have become final pursuant to California Penal Code § 3041(b) and § 3041.2(a), whichever is later; and
5. The Clerk of Court is DIRECTED to enter judgment.

IT IS SO ORDERED.

**Dated:    March 30, 2010**                           /s/ Anthony W. Ishii
                                                   CHIEF UNITED STATES DISTRICT JUDGE